# Warren-Ehret Company *v.* Byrd, Appellant.

*Contract—Building contract—Subcontractor—Architect—Arbitration.*

Where an arbitration clause in a building contract is limited by its express terms to disputes between the owner and the contractor, or between the contractor and a subcontractor, such clause cannot be extended to a dispute between a subcontractor and a person furnishing the latter labor and materials.

In an action by a person furnishing material and labor to a subcontractor under a building contract, the defendant cannot complain of a substitution of one method of doing the work for another, if it appears that the plaintiff made the substitution in accordance with the direc-

tions of the architect and the other parties in interest and that such substitution imposed no additional burden upon the defendant; and this is the case although the defendant was not present when the substitution was directed by the architect.

A provision for a guaranty from a subcontractor in a building contract cannot be extended by the subcontractor to a contract between himself and a person furnishing him labor and material unless he expressly stipulates for such guaranty.

Argued Jan. 14, 1908.   Appeal, No. 267, Jan. T., 1907, by defendant, from judgment of C. P. No. 2, Phila. Co., Sept. T., 1903, No. 2,782, on verdict for plaintiff in case of Warren-Ehret Company v. John Byrd.   Before Mitchell, C. J., Fell, Brown, Mestrezat, Potter, Elkin and Stewart, JJ.   Affirmed.

Assumpsit to recover under a contract for roofing.   Before Barratt, J.

The court charged in part as follows :

It appears that an athletic association connected with the University of Pennsylvania entered into a contract with Wells Brothers Company (whom I will hereafter call Wells for brevity whenever I allude to this firm) for the performance of some work at Franklin Field, which embraced the erection of a grand stand, and it further appears that Wells entered into a contract with the defendant, Byrd, for a part of the work which included at least the placing of what has been called a slag roof upon or in connection with this grand stand.   Wells was the direct contractor with the athletic association, and the defendant, Byrd, was a subcontractor of Wells.   It further appears that the subcontractor, Byrd, entered into a contract with the plaintiff, the Warren-Ehret Company, for the erection of this slag roof, the contract consisting of two letters, which are as follows :

"Philadelphia, 3/20, 1903.

" Warren-Ehret Co.,
    " Land Title Building.
" Gentlemen :—
    " Please furnish and put on . . . . the Four-ply Slag Grit Roofing on Grand Stand at Franklin Field, in accordance with plans and specifications.

" All the above work to be done at four (4) cents per square foot, less one-half cent (½) per square foot and same to be applied promptly and without delay when ready.

" Yours truly,<br>
" JOHN BYRD."

"March 23, 1903.

" MR. JOHN BYRD,
  " 1426 Catherine St.,
   " Philadelphia, Pa.
" Dear Sir :—
  " We have booked your order for covering the roof of the Grand Stand, Franklin Field, for the University of Pennsylvania, as per your order of March 20, 1903, with a Four-ply Slag Grit roof, guaranteed against natural wear and tear for ten years, as per plans and specifications at the rate of four cents (.04) per square foot, less a rebate of one-half cent (.00½) per square foot. The work to be done promptly and without delay. You will kindly notify us about three or four days before the roof is ready for us.
  "Thanking you for the order, we remain,

" Yours very truly,<br>
" Warren-Ehret Company,<br>
" ALONZO GIBBONS, Secretary."

By this contract the defendant, Byrd, ordered a four-ply slag grit roofing to be put on the grand stand at Franklin Field in accordance with plans and specifications. The plans and specifications you will have out with you. The price for the work is stipulated, and the work is ordered to be done promptly and without delay. The plaintiff company accepts this order, accepts the price stipulated, agrees to do the work promptly and without delay, guarantees the roof against natural wear and tear for ten years as per plans and specifications.

This is the contract between the parties to the case which you are now trying. You have heard a great deal of discussion about the terms of the contract between the defendant Byrd, and the direct contractor, Wells, and while I instruct you at this point that the covenants of that contract are not binding upon the plaintiff in this case, I desire to say but a word upon the subject so as to rid your mind of any ambiguity

or uncertainty that may have arisen concerning the matter. [Before the Warren-Ehret Company could be held to be bound by the contract between Wells and Byrd, it would have to be shown that the Warren-Ehret Company had agreed, in its contract with Byrd, to accept as applying to itself the terms and covenants of Byrd's contract with Wells.] [14] While some of the letters written by Mr. Byrd to the plaintiff which are in evidence (and you will have them out with you), state that the plaintiff would be held to the performance of its work under Byrd's contract with Wells, because the plaintiff had agreed to the terms of that contract, Byrd's testimony upon the stand, when he was relating a discussion which took place between him, Mr. Duross, of the plaintiff company, and Mr. Gilbert, of Wells, was (although this is entirely for you to recall) that Mr. Duross of the plaintiff company refused to accept the terms of that contract and thereby release him from their operation as against him. This is Byrd's sworn testimony, and if it is true, notwithstanding that he says that Duross prior to that interview had agreed to accept the terms of his (Byrd's) contract with Wells, that acceptance never became an accomplished fact, nor is there anywhere in the evidence anything shown of a legal consideration passing between Byrd and the plaintiff for the alleged superseding contract. I say superseding, because [according to the contract between Byrd and the plaintiff, as constituted by the letters of March 20 and 23, the plaintiff did not either directly or by implication agree therein to be bound by the terms of any contract except that of the two letters, and therefore, if the plaintiff at any time assumed Byrd's contract with Wells, it must have been subsequently to March 23, 1903, and, therefore, a superseding contract.] [15]

[And even if, as contended by the defendant, the acceptance of the contract by the plaintiff in the letter of March 23, to do the work according to the plans and specifications, which plans and specifications were contained in the contract between Byrd and Wells, brought to the notice and knowledge of the plaintiff the covenants contained in that contract, the plaintiff could not be bound by those covenants, at least in so far as doing the work to the entire satisfaction of the architects was concerned, and in so far as making the final acceptance of the work and payment therefor dependent upon the accept-

ance by the architects of the work to their entire satisfaction, and in so far as making the architects the final arbiters of any and all disputes or differences of opinion that might arise between any contractors or subcontractors, because in defining what is meant by contractors and subcontractors this contract between Wells and Byrd says that "whenever the word contractor is used in this specification it refers to those having a direct contract with the owner"—Wells, "and to subcontractors to such direct contractors"—Byrd to Wells, "and to no other persons whatsoever." As the plaintiff is a subcontractor of a subcontractor, he comes under the phrase "no other persons whatsoever," and, therefore, the plaintiff is expressly excluded in respect at least of the matters to which I have just referred in which the architects' powers, control and supervision over the work are defined.] [16]

You therefore have the issue very plainly marked out, although you will probably be met with some difficulty in solving the questions because of the conflict of the evidence that has been presented before you.

[Now, the issue plainly stated is: The plaintiff having entered into a contract to do this work according to certain plans and specifications, has it done the work in a workmanlike manner in substantial compliance with the terms of the contract as constituted by the two letters referred to? [17]  Well, the plaintiff says yes; the defendant says no. You must ascertain the fact.

I do not propose to go into the details of the testimony with you, but will leave all of the evidence, where it properly belongs, with you.

[According to the plaintiff's evidence the exact requirements of the specifications were not complied with. They tell you in substance and effect that very shortly, I think within a day or two, after they began work, a question arose as to whether they were putting down four-ply felt and pitch in the manner as required by the specifications. They say that they then laid a sample portion of the roof in the presence of the architects, and I think a representative of Wells (if I am in error you will correct me), and that it was satisfactory to them, and that they were directed to proceed in that way, and they tell you that they did so proceed with the work. My instruction to

you upon this branch of compliance with the specifications is that if you believe that, although the specifications directed a certain method, all the parties in interest agreed that another method should be substituted, then so far as the substituted method was carried out, if you believe that it was carried out, there was substantial compliance in respect of that part of the specification.] [18]   If you do not believe such to have been the case, then there was a direct violation of the contract, and so far as that violation would, in your judgment, affect in dollars and cents the claim of the plaintiff here, the amount of the verdict, if you should reach the question of amount, would be affected.

I think that it is safe to say that it is a conceded fact that this roof leaked.   The plaintiff contends that the leaks were caused, not by improper material or defective workmanship, but by the fact, as it alleges, that certain lag screws were falsely placed, as the architect described it, through this roof. It appears that upon the roof there were a large number of iron benches screwed fast with 22,000 lag screws, and the plaintiff contends that a great number of them, instead of going through the roof and into the rafters underneath, as they should have done, missed the rafters in a very great many places (you will remember all this evidence), and thus afforded a means by which water could percolate through the roof.   The plaintiff further contends that the water did percolate through these falsely placed lag screw holes, and that to these falsely placed screws alone is attributable the fact of the leaking of the water through the roof.   On the other hand, the defendant contends, and has produced a number of witnesses to prove, that there were comparatively few falsely placed lag screws, and that this leakage was not at all attributable to the lag screws that had failed to penetrate the rafters, as you have heard described ; but that it was due to defective workmanship by the plaintiff, in that the places upon which the sleepers were to rest were not properly covered with pitch in accordance with the plans and specifications, and that there were spaces between the stringers of from one-eighth to one-quarter of an inch, left by the plaintiff's workmen, through which the water found an outlet.

The defendant resists the claim of the plaintiff upon the

further ground, as he alleges, that the felting was not four-ply over the whole roof, as required by the specifications, but was a three-ply solid roof with a dry sheet underneath it. Some of the witnesses have testified to this effect, although I think, and you will correct me if I am wrong, that the defendant on the stand said that the under sheet of felt was not improperly laid without pitch under it, because if pitch had been put under the lower sheet of felt, the shrinkage of the boards would have had a tendency to have torn the felt which would have adhered to the boards because of the pitch if so applied. That is the way I understood the defendant to have testified upon this subject. As I have said, you will substitute your own recollection for mine, if I am in error. The plaintiff contends that it is a four-ply felt covering.

The defendant also sets up as a defense a further violation by the plaintiff of the specifications in that the pitch was not properly applied for the carpenters in placing the stringers or other woodwork, you will remember what it was, in adjusting the seats upon this roof; and also that the slag or slag grit was not of the sizes specified, and that because of this there was a great deal of washing of sand into the gutters, damaging the gutters and necessitating the hauling away of this sand at some considerable expense. The plaintiff meets this by telling you that the slag grit placed upon this roof was the commercial article which fully met the specifications, and that the quantity of it that he saw in the gutters was no more than must reasonably be expected in the case of a new roof of this kind. The architect told you that there was too much of this slag grit used, which would affect the question of performance in a workmanlike manner only, because the specifications, as I have read them, do not state the amount or quantity of slag grit to be put on. The defendant further tells you that at an expense of something over $750 he had had the leakage of the roof stopped, and that the bill for hauling away the loose sand was $150, but as to these amounts it is proper to say that there has been no itemization given you in the evidence.

I think that I have thus substantially stated to you the contentions of the plaintiff and the defendant. You will remember everything in the case, and give to all of it very careful

consideration.   If I have misstated anything, you will correct me by your recollection, and the same applies to any omissions that I may have made.   In other words, the whole case is in your hands.

If you find, after a very careful consideration of the whole matter, that the plaintiff committed such breach or breaches of the contract as not to have performed his work in substantial compliance therewith and in a workmanlike manner, then you will have to find a verdict for the defendant.   [If, however, you should finally determine that the plaintiff has performed the work embraced in the contract in substantial compliance with it, and in a workmanlike manner, then you may find a verdict for the plaintiff.] [19]

[As to guarantee of this work, the contract between the plaintiff and the defendant provided that the plaintiff's guarantee was to be against natural wear and tear for ten years, as per plans and specifications, and I instruct you that there is nothing in the evidence upon which you could base a finding that the plaintiff's guarantee should take a wider scope.   It is not a valid defense that the plaintiff has not given a separate and formal guarantee, because the guarantee contained in his letter of acceptance of the order to do the work is just as binding upon him as a separate written guarantee would be. [20]

[So far as concerns leaks caused by work done or material furnished by anybody other than the plaintiff, if you find that leaks were so caused, the plaintiff is not responsible for them.] [21]   So far as leaking of this roof due to defective workmanship or material, either or both, on the part of the plaintiff, is concerned, if you find that the leakage came about in this way, as alleged by the defendant, the plaintiff is responsible, and, if you find that such was the case, you will take it into consideration along the lines of my previous instructions to you upon the law.

[The plaintiff claims for the entire work at the contract price for something over 76,000 square feet of roofing, which it alleges amounts to $2,682.68, upon which it asks for and is entitled to, if you find for the plaintiff, interest from September 21, 1903, at which time it alleges, and it is not denied, that it tendered to the defendant a written guarantee in addition to and following the terms of the guarantee contained in its

letter of acceptance of the order to do this work.] [22] The plaintiff claims that the work was at this date fully completed, and that it was done, and the materials furnished, in substantial compliance with the terms of the contract.

Verdict and judgment for plaintiff for $3,233.61. Defendant appealed.

*Errors assigned* among others were (14–22) above instructions, quoting them.

*F. S. Brown*, of *Simpson & Brown*, with him *C. W. Van Artsdalen*, for appellant.—The law is well settled that the reference in a contract to another writing or document reads the writing or document so referred to into the contract, and the parties thereto are bound by the writing referred to just as much as if the paper referred to had been set forth at length in the contract.

In the case of Philadelphia v. Jewell, 135 Pa. 329, plaintiff is a subcontractor within the meaning of the specifications: Thorington v. Smith, 75 U. S. 1; Young v. Gas Co., 5 Pa. Superior Ct. 232; Smith v. Hickman, 14 Pa. Superior Ct. 46; Morrison v. Wilson, 30 Cal. 344.

Plaintiff, having changed the manner of erecting the roof without the consent or knowledge of the defendant, is not entitled to recover, and the burden was upon the plaintiff to prove affirmatively that it erected the roof in accordance with the specifications: Hartupee v. Pittsburg, 97 Pa. 107; Hand v. Baynes, 4 Wharton, 204; Rogers v. Davidson, 142 Pa. 436.

*M. Hampton Todd*, for appellees.

OPINION BY MR. JUSTICE STEWART, March 2, 1908:

The defendant, John Byrd, here the appellant, engaged as subcontractor to construct the roof of a gymnasium according to certain plans and specifications. Byrd in turn sublet his contract, engaging one party to do the carpentry in connection with the roof, and the plaintiff company to cover the roof as constructed by the carpenters with what is called four-ply slag grit roofing. When completed the roof was found defective in that it leaked. The present action was brought

by plaintiff company to recover the contract price for the slag grit roofing. On the trial the plaintiff's right of action was denied, on the ground that the contract between the parties provided for a reference of all disputes that might arise to the architects, whose decision should be final; and that the particular dispute here, namely, whether the slag grit roofing provided by the plaintiff company corresponded to the specifications, had been determined by the architects adversely to the plaintiff. The reference to the architects had been made at the instance of the defendant, and not until after the present action had been brought. It was not attempted to be shown that the plaintiff company appeared by anyone before the architects in the investigation made, or consented to the reference, or recognized in any way the right of the architects to pass upon any dispute between it and the defendant. This left the question to be determined under the terms of the contract. The plaintiff's contract is expressed in its letter accepting the defendant's order. It reads as follows: "We have booked your order for covering roof of the grand stand, Franklin Field, for the University of Pennsylvania, as per your order of March 20, 1903, with a four-ply slag grit roof, guaranteed against natural wear and tear for ten years, as per plans and specifications at the rate of four cents (.04) per square foot, less a rebate of one-half cent (.00½) per square foot." The plans and specifications here referred to are those which accompanied the contract with the general contractor, and with which the plaintiff company was entirely familiar. So far as these related to the particular work which plaintiff had engaged to do, they became part of its contract with the defendant, and plaintiff would be entitled to recover only as compliance was shown. But beyond this plaintiff was not bound by any of the provisions or stipulations in the general contract. It was not a party to it, and was not made subject to it by its terms; on the contrary, that contract, providing among other things for a reference to the architects of all disputes which might arise between any two or more contractors or subcontractors, or between any of the contractors and subcontractors, or between the owner and any contractor or subcontractor, in express terms excludes the plaintiff, and those like it, doing work or furnishing materials to a subcon-

tractor, from its operation. It provides that: "Wherever the word contractor is used in this specification it refers to those having a direct contract with the owner, and to subcontractors to such direct contractors, and to no other persons whatsoever." In this contention, therefore, a finding by the architects with respect to a controversy between these parties, was not only immaterial but wholly incompetent as evidence. The defendant was a subcontractor to the direct contractor; but the plaintiff stood in no such relation, his relation being with a subcontractor. The offer to show such finding by the architects was properly refused by the court.

The plaintiff offered evidence to show a substantial, if not strict, compliance on its part with the plans and specifications; that it had done its work in a workmanlike manner, and that the leakage was due to the defective manner in which the carpentry work, for which it was not responsible, was done. The defendant, on the other hand, offered evidence in support of his contention that the fault was with the slag roofing, and that it was defective because of failure to conform to the specifications; that the felt used was not lapped as required; that hot pitch had not been used in laying the sleepers, and that the slag grit used was of smaller size than the specifications called for. These were the questions of fact submitted to the jury in a charge which, with entire fairness, so far as we can see, summarized and presented the evidence. The finding of the jury in favor of the plaintiff for the full amount of its claim is a virtual affirmance of each of the plaintiff's contentions in this regard. Whether it was a four-ply felt that plaintiff was using, and whether the pitch was being used in the way required, were subjects of dispute very early in the course of the work. The plaintiff's evidence was to the effect that as soon as it knew of any dissatisfaction, it asked the architects to inspect a sample of work laid, and upon inspection, after explanations given, the architects expressed their approval, and directed the company to proceed and finish the work according to sample. The defendant was not present. The instruction of the court with respect to this feature of the case was as follows: "My instruction to you upon this branch of compliance with the specifications is, that if you believe that although the specifications directed

a certain method, all the parties in interest agreed that another method should be substituted, then so far as the substituted method was carried out, if you believe it was carried out, there was substantial compliance in respect of that part of the specifications. If you do not believe such to have been the case, then there was a direct violation of the contract." The plaintiff's contention was: (1) that there was no departure from the specifications in any material effect; (2) that even though a variation were shown, the work done corresponded exactly to the sample exhibited to the architects and which met their approval. Because it was not shown that the defendant was present when the examination was made by the architects, and the plaintiff was directed to proceed according to the sample, it is argued that submission to the jury to find whether all the parties in interest agreed that another method should be substituted, assumed a fact for which there was no support in the evidence. In a certain sense the defendant was a party in interest, and we must assume that he was not present at the inspection. But his interest was not such as made him a necessary party to an agreement of substitution or change made between the contractor under him and the architects. His only interest was to have the work done in a way which would meet the approval of the architects, who, under the terms of his contract, were to be the final judges in any dispute between him and the contractor over him with respect to the work. Of course, it would have been otherwise had the change, if any were made, imposed any additional burden upon him, but nothing of the kind could have resulted. The plaintiffs, in submitting to the architects a sample of their work, did nothing beyond what the defendant would have been obliged under his contract to do, had he undertaken the work himself. In proceeding with the work in the manner directed by the architects, they were meeting the requirements of defendant's contract much more certainly than by any other course, since the architects were the final arbitrators. If the agreement contemplated a substitution of one kind of work for another, and such substitution was in fact observed by the plaintiff, it was binding on owner and contractor alike under the contract, Robinson & Kennedy v. Baird, 165 Pa. 505, and was without prejudice to the defendant. The

fact that the latter was not present or consulted with regard to it, is an immaterial circumstance. If, in consequence of such circumstance, the roof proved defective, the responsibility would not rest with the defendant. Such fact could not prevent his recovery of the contract price.

With quite as little reason can default on part of the plaintiff be claimed because of failure to give defendant a written guarantee corresponding in form to that expressed in the original plans and specifications. The entire contract between plaintiff and defendant is to be found in defendant's written order and plaintiff's written acceptance. The latter expressed a guaranty, and it is by no means certain that any other was in contemplation of either party. Be that as it may, the form of guaranty expressed in the plans and specifications was not for plaintiff's but defendant's observance as part of the latter's contract. If defendant proposed to exact from plaintiff such a guaranty, he should have stipulated for it. The plain reading of the plaintiff's letter of acceptance makes it clear that the words, " as per plans and specifications," referred to the work to be done and nothing else. The guaranty which plaintiff subsequently tendered, while, as we think, unnecessary, covered fully plaintiff's entire engagement in this regard. In point of fact the difference between it and the guaranty provided for in the plans and specifications is unsubstantial. It would be a narrow construction that would give one a larger effect than the other.

The case was fairly submitted to the jury, and we see no merit in any of the assignments of error.

Judgment affirmed.